The next case this morning is 524-0401 People v. Lowry. Arguing for the appellant is Lou Viverito. Arguing for the appellee is Gary Gennady. Each side will have 10 minutes for their argument. The appellant will also have five minutes for rebuttal. Please note only the clerk of the court is permitted to record these proceedings today. Morning, everybody. Morning, your honor. Morning, your honor. Appellant, if you're ready, you may proceed. Thank you, your honor. May it please the court, counsel, Lou Viverito of Taylor Law Offices on behalf of Austin Lowry. The primary focus of this argument this morning will be the first issue presented for review. And that issue is whether the evidence presented by the prosecution at trial was sufficient to prove beyond a reasonable doubt the elements of the charge of failure to reduce speed to avoid an accident. The elements of that charge do not appear to be disputed issues of law. Mr. Lowry on pages 16 and 17 of his brief relied upon People v. Galarza, a 2023 opinion of the Illinois Supreme Court, concerning those elements. And those elements being careless driving and a failure to reduce speed to avoid an accident. Similarly, in the state's brief on page four, the state also contends that the elements are driving carelessly and failing to reduce speed to avoid an accident. The dispute relates to the application of those elements of law to the facts that were presented at trial. This case originated as a result of a two vehicle collision that occurred in Clark County on August of 2022. Austin Lowry was the driver of an automobile. Joseph Rosenberry was identified as the driver of a motorcycle. And Tasha Davis was identified as a passenger on that motorcycle. When the case proceeded to trial, Tasha Davis was deceased. Joseph Rosenberry, although he testified, stated that he had no recollection of any events after he and Ms. Davis had lunch at Moonshine on that date. The accident occurred at approximately 5 p.m. on that day. So he wasn't able to relate any of the events that led up to the accident. Four other witnesses testified. Each of them was involved as a law enforcement officer in one or more capacities. The first of those witnesses was a Clark County correctional officer Robert Ryan. He was the first person to arrive at the accident location. He saw a motorcycle lying in the roadway of Route 40, a man under a guardrail who was later identified as Joseph Rosenberry, and a woman who appeared to be deceased lying on the road. That person was later identified as Tasha Davis. Correctional officer Ryan testified that Austin Lowry was in a state of shock, that he repeatedly stated he could not see because of the sun. Now, upon examination of officer Ryan by the court, the trial judge asked officer Ryan what were the precise words of Austin Lowry when he repeated that statement. And officer Ryan stated that Austin said, I couldn't see because of the sun, I didn't see them because of the sun, and that he said it three or four times. Clark County deputy Hanley was the next officer. Can you pause here for a second? Did he do anything? Usually when I see the sun, I put my hand up where the sun is so I can see. So he didn't do anything then, is that what you're saying? No, I'm not saying that. He just looked into the sun and said, I can't see, rather than putting his hand up and blocking the sun. Well, his statement was that he couldn't see. There was no testimony. But he didn't do anything to try to see. Like, he didn't put his hand up where the sun is. That's what you do. It's obvious. Well, there's no evidence that he didn't do that. There's no evidence that he did. He didn't say he didn't see. He was asked what he did, and he said he saw the sun. He didn't do anything. He didn't say, I did this so I could see. He didn't say anything. He didn't say that. He didn't say I slowed down either, did he? He didn't say that either, but there's no evidence that he didn't do anything. Right. Kept his speed up, correct? There's no evidence that he kept his speed up. Well, he didn't say he slowed down, did he? What he said does not mean that something he didn't say either occurred or didn't occur. Okay, so he could have slowed down. He could have slowed down, put his hand up, but he didn't say that. Yeah, he may have slowed down. In fact, the evidence is... The evidence was that it was going so fast by the state police, right? They calculated it. The accident reconstruction officer, Ryan Breesacker, testified that about the time of the accident, his estimate was that the car was going in an estimated range of 56 miles an hour to 69 miles an hour. What he didn't do is... The speed limit there was 55, correct? Right, and his estimate, which included 56, was just that, an estimate. What he didn't do was say the speed of the vehicle at the time of impact was and then some speed. He didn't determine it. He simply gave a range. Mr. Viveretto, I have a question. The motorcycle was found at the bottom of the crest of the hill? I can't say that it was at the bottom. It was on the downside of the hill, and Trooper Moore, who was the first Illinois State Police Trooper who arrived, said the hill crest was approximately a quarter of a mile from the accident location, but I can't say that the accident location was at the bottom of the hill, and there was no evidence. I thought there was no measurement of the crest of the hill to the point of impact. Oh, there was. Trooper Moore said that it was about a quarter of a mile. Trooper Bresecker, the accident reconstruction officer, didn't measure it, so the only evidence was approximately a quarter of a mile. Now, one of the significances of that distance is, for example, at 60 miles an hour, it would take 15 seconds to travel a quarter of a mile. What wasn't presented in the evidence is, when was Austin Lowry blinded by the sun? The trial court made a finding that he was blinded by the sun, but the trial court didn't make any finding regarding the location of the two vehicles, the car and the motorcycle, when Austin was blinded by the sun. There was no evidence presented because the accident reconstruction officer didn't have the information to determine what the location was of the vehicles, the distance between the vehicles, when Austin Lowry was blinded by the sun. So, what Trooper Bresecker could say and did say is, if Austin Lowry was driving his vehicle at 55 miles an hour when he was blinded by the sun, because there were no occurrence witnesses, no person involved in the accident testified, Officer Bresecker said he could not determine whether sufficient time existed between the sun blindness and the time that the motorcycle then appeared again in the vision of Austin Lowry for Austin Lowry to avoid the accident. He said Austin Lowry applied the brake before the accident, but because of the unknown information regarding where the vehicles were when Austin was blinded by the sun, what the speed of those vehicles were when Austin was blinded by the sun, the distance between them, we don't know if both of those vehicles were traveling the speed limit of 55 miles an hour when they came over the hill crest. We don't know whether there was sufficient distance between those vehicles, so one car length per every 10 miles an hour, we don't know that. All we know is the court found Austin Lowry was blinded by the sun, but there was no finding and no evidence regarding when he was blinded by the sun during that quarter of a mile from the hill crest to the accident location. But your client had a duty to decrease his speed approaching the crest of a hill. Yes, there's no evidence that he didn't decrease his speed. There's no evidence of what his speed was as he approached the hill. One question I have, he knew the motorcycle was ahead of him, didn't he? When there's some evidence of that? Trooper Moore talked to Austin Lowry, and Trooper Moore testified that Austin Lowry said when he crested the hill, he saw the motorcycle, and then when I asked Trooper Moore about what happened then after that, he acknowledged that at some point after Austin saw the motorcycle and before the accident location, Austin told him the motorcycle then suddenly appeared in front of me. So again, no witness who testified had the information necessary to say here's what the location was of the vehicles when the at the time the sun blindness occurred. And frankly, Correctional Officer Ryan said Austin was distraught. He was in shock. So whether he was even in a position to relate any of those kinds of details other than I couldn't see because of the sun is questionable. But the fact is there was no evidence regarding where these vehicles were when the sun blindness occurred and Trooper Breesecker candidly testified without having all of those details. He could not determine whether sufficient time existed for Austin Lowry to do three things. First of all, perceive what Officer Breesecker called a threat. The first threat was the sun blindness. And once that was perceived, then the next step is process. In other words, what do I do? Is there somebody behind me? So if I slow down, I'm going to get hit. What do I do here? So it's processing it. And then the last step in that is react. There was a second threat, according to Officer Breesecker, and that is after the sun blindness, when now the motorcycle is right in front of Austin's car, how does Austin then perceive, process, and react to that? All we know is when that motorcycle came into Austin's vision again, he applied the brake. Those facts are strikingly similar to the facts in Brandt. And Brandt decided on pages 23 through 25 of the brief, Brandt was driving a motorcycle. There was a parked car that was partially obscured by the shade of a tree. Brandt didn't see it. When he did see it, he applied the brakes, but there was still a collision. Brandt was charged with driving under the influence of alcohol and failure to reduce speed to avoid an accident. He was found guilty of both of those. The appellate however, affirmed the finding of guilty on the driving under the influence of alcohol, but reversed the finding of guilty and the conviction on the failure to reduce speed. Counsel, I gave you quite a bit of time after your time expired due to the questions, but I would ask you to please go ahead and wrap up. In any event, I'm respectfully requesting the court to carefully examine the evidence, apply that law for which there doesn't appear to be any dispute, and then reverse the judgment and sentence imposed by the trial court. Thank you. And you will of course be given time for rebuttal. Appellate, you may proceed. Thank you, your honor. May it please the court, counsel. Defendant was convicted of failure to reduce speed to avoid an accident. And as counsel has pointed out, two elements are defendant has to be shown to have been driving carelessly, which is defined as failure to exercise due care under similar circumstances, like an ordinary reasonable person would. And it also must show that they failed to reduce speed. And I comment briefly on the fact that I believe that counsel's argument with respect to what hasn't been shown and what needed to be shown, et cetera, basically one thing that we do not have to show, the state didn't have to show was the fact that this was an unavoidable accident. I think that's what defense counsel is really kind of arguing is, well, we can show this, we can show that, therefore we can't say this accident wasn't unavoidable. Well, in case that I cited, Laura, that I cited in my brief, one of the things that talked about it was the fact that an argument was made that the state didn't, the trooper didn't allege how fast the individual was driving at the time. And what the court said is the court said, when an officer issues a citation for failure to reduce speed to avoid an accident, the citation is generally issued after the vehicle has come to a sudden halt as a result of a collision. In this situation, the officer can make no observation of the speed of the defendant's vehicle prior to the collision. The officer would nearly be impossible task of attempting to subsequently reconstruct an objective determination of the defendant's speed for purposes of alleging that speed in the complaint. It's the same thing here. As counsel points out, there were no eyewitnesses and so in this case, having to take and show what the speed was before, the distance between, et cetera, are all facts that take into establish an unavoidable accident, which is not part of the state's case. What the evidence does show in this case, I think, obviously, as most of the facts recited by counsel, defense counsel, the defendant admitted to being the driver of the Chevy. The accident here occurred with the point of impact that was testified to. The point of impact was in the westbound lane. Now, the vehicles were traveling westbound. I'm not familiar with Clark County, but from what I can gather, County Road 40 is an east-west road. They were traveling west, which means they were traveling toward where the sun would set. In the westbound lane of Route 40, toward the east side of the intersection. The point of impact was near the intersection, but it was before the intersection, which is in keeping with the fact that Joseph Roseberry testified that he had a camper about a mile or so down the road on Baystown Road, and that he had been working remotely from that camper. Obviously, what the evidence establishes and what the reasonable inferences establish is that Joseph Roseberry was headed back to his camper with Tasha Davis as his passenger. He was going down Route 40, got close to the intersection, reduced his speed. One thing that counsel didn't point out was the fact that Mr. Roseberry's speed was estimated to be 8 to 20 miles an hour, which clearly indicates he is slowing down to make a turn on the Baystown Road to go to his camper. What the other evidence establishes is that on that crest, as you come down, there are no obstructions. Clear view. The only thing that would create an obstruction would be a setting sun or sun in your eyes. What we have is defendant's admission that he saw the motorcycle. As he got to the crest of the hill, he saw the motorcycle. Ergo, he knew the motorcycle was in front of him. We don't have to show that distance as to when he first saw it and how far they were between. He saw it. Having seen it, when he now crests the hill and starts going down, all of a sudden, by his own admission, I can't see the motorcycle. The sun is in my eyes. I can't see. I didn't see them. Nothing is done to show that he did anything to address the question of the sunlight. What the evidence shows is between going as fast as he was, 56 to 69 miles an hour, he was still traveling at his highway speed, even though he testified the sun was in his eyes. What then happens is, when he does get to that point down where that impact was, which was, as I said, near the intersection of Westbound Lane toward the east side of the intersection, all of a sudden, the motorcycle appears. He hits his brake, which, again, based on a device in the vehicle, indicated that the time between when he first braked and the impact was one half of one second. When he finally saw the motorcycle, he was right on top of it. The people submit, and by the way, there were no skid marks. There was nothing in there that that he had seen the motorcycle any time sooner than the one half of one second before he initiated his brake. The motorcycle was found under a guardrail. If my memory serves me correctly in looking at the photographs, the guardrail was past the intersection. That's where the motorcycle was found, and that is where Mr. Roseberry was found. Tasha Davis, according to the reconstruction, must have been hit with such force, was flipped off the bike onto the windshield of the car, and then ended up in the roadway. So, considering the totality of the facts and the evidence that was brought out, as well as the reasonable inferences that we can draw from those facts, the people submit that the defendant was proved guilty beyond a reasonable doubt of failing to reduce speed after having and driving carelessly down Route 40 and not taking any kind of precautions at all to address the sunlight, the speed, and knowing that there in front of him that he could not see. And this case is distinguishable from the case cited by counsel, because in that case, what counsel indicated the facts, the guy was riding a motorcycle. He didn't see the car ahead of time because of the fact that it was in the shade of a tree. That is a very key distinguishing feature, because in this case, defendant knew that motorcycle was in front of him before he couldn't see it. So, under the circumstances... The natural implication is he didn't expect the motorcycle to be slowing to eight miles per hour. You would expect that people continue moving at the same rate of speed as you're traveling down the roadway unless you see a brake light. So, it's reasonable for the defendant to believe that the motorcycle continues at 55 miles per hour. There's also the fact that defendant is supposed to obviously keep his car in control, supposed to be cognizant of the fact that cars may be turning. Cars don't necessarily always go straight. Cars do stop. Cars do make turns. Well, those are general rules of the road, but under this circumstance, even if he had reduced his speed to 45 miles per hour as he crested the hill, by my calculations, he would have had 20 seconds if the motorcycle was going 12 miles per hour to react, to see it, to perceive it, react, and then stop if the collision occurred at a quarter of a mile from the crest of the hill. So, he had 20 seconds basically to do everything if he was just theoretically going 45 miles per hour. He wasn't going 45 miles per hour, and perhaps the reason he was going 56 is because he was on a downhill slope. I mean, he could have been going 55. I don't know how accurate, based on my experience with these reconstruction, I don't know where he comes up with 56 as opposed to 55 miles per hour, but certainly if you're going 55 and now you're going downhill, you may get an extra mile per hour on your speedometer. So, the thing about it, though, is your honor, is the fact that, how can I say it? Well, first of all, first of all, from my experience, I can honestly take and tell you that when you're going down the crest of the hill and your speed is beyond the speed limit, you may, can, and will get stopped for speeding because I have had that experience. No, and you should probably hit your brake, especially if the sun comes in your eyes. Well, now you've got the sun, and then on top of that, if you're going downhill, you have to adjust your speed. You're supposed to have your foot on the brake. You're supposed to be reducing to begin with, but to take and say that, you know, because he, because we can presume or assume that he may have thought that the bike was going forward. I have a problem with that in the overall safety of driving. In consideration of the facts, the fact that he was blinded by the sun, even though if he would have had an additional 20, an additional four seconds, you know, you had, you calculated, or five seconds, you calculated 20, I also calculated 15. The point is, is the fact that you have to take and account for the facts that you can't see. You can't assume anything at that point. That's the problem. You just can't assume anything because anything can happen, and the unfortunate part is what happened here, not having maybe the additional five or six seconds that would have allowed Mr. Rosenberry to make the turn, we have an accident instead. So that's my only, I understand what you're saying, your honor, but that's my only problem that I have with it. Okay, thank you. Thank you. Justice Welch, any further questions? No further questions. Rebuttal? The state's position essentially is Austin Lowery was careless because when he was blinded by the sun, he didn't abide by a duty. However, in the state's brief, on page 11, the state says, the gravement of the offense of failing to reduce speed to avoid an accident is the action taken by a driver to assess a danger and decrease whatever speed their car is traveling at the time to avoid striking another vehicle or person. That's essentially what Officer Breesecker's testimony was about. Austin's blinded by the sun, so there's not an immediate reaction to that. First, he perceives the sun blindness, then he processes it, trying to make a decision on what's the best course of action, and then he reacts. That's the first threat that Officer Breesecker testified about. The second threat was now the motorcycle appears in front of Austin, and he's going through that same chronology, perceiving it, processing it, and reacting it. We know he reacted eventually because he applied the brake. The issue seems to be, does failing to reduce speed mean you could have reduced your speed? In other words, to avoid an accident, you were in a position to do that. The mere fact of an accident, as stated in the opinions cited by both parties in this case, is not evidence of carelessness. That reference to failing to reduce speed implies you have the ability, knowing what the circumstances are, to reduce your speed. Now, just as Case points out, kind of time elements here. If it was 55 from the hill crest to the point of impact, that's 15 seconds. If Austin was blinded by the sun halfway down to the accident location, that's seven and a half seconds. If he was three quarters of the way down there, now we're at 3.75 seconds. So the issue here is, once those threats arose, did Austin have sufficient time and distance to avoid the accident? This is all part of the state's burden to prove. This isn't something that Austin Lowry has to prove. The state has to prove carelessness, and they seem to be saying, well, he was careless because he didn't do anything. He did something. He perceived two different threats, he processed two different threats, and he reacted. It's not that he didn't do anything. The problem is, apparently, and the state presented no evidence on any of these issues, when those threats occurred, there was not sufficient time in order for Austin to avoid the accident. And that's consistent with Officer Breesecker's testimony. And Officer Breesecker was testifying in this case on behalf of the prosecution. So for all those reasons, again, Your Honor, we're requesting the court to reverse the judgment of the circuit court in this matter. Thank you. Any further questions of Justice Cates? Thank you. Justice Welsh? Questions? All right. Thank you both for your arguments. We will take this matter under advisement and issue a ruling in due course. Thank you.